**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

AARON SKINNER,

        **Plaintiff,**                               **CIVIL ACTION NO. 07-11512**

vs.

                                         **DISTRICT JUDGE PAUL D. BORMAN**

**COMMISSIONER OF**              **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

        **Defendant.**
_____/

## REPORT AND RECOMMENDATION

**RECOMMENDATION:** This Court recommends that Defendant's Motion for Summary Judgment (docket no. 6) be GRANTED, that Plaintiff's Motion for Summary Judgment (docket no. 7) be DENIED, and that Plaintiff's Complaint be DISMISSED, as there was substantial evidence on the record that Plaintiff remained capable of performing a significant number of jobs in the economy.

                                                   \*\*\*

Plaintiff filed an application for Disability and Disability Insurance Benefits with a protective filing date of June 29, 2004, alleging that he had been disabled and unable to work since November 17, 2003 due to knee problems. (TR 52-54, 63, 66). The Social Security Administration denied benefits. (TR 31-35). A requested *de novo* hearing was held on April 12, 2006 before Administrative Law Judge (ALJ) Robert C. Tronvig, Jr. who subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits because he was not under a disability at any time through the date of the ALJ's June 28, 2006 decision. (TR 14-22, 201). The

Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 3). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

Plaintiff was forty-seven years old at the time of the administrative hearing. (TR 204). Plaintiff has two years of college education. (TR 72, 204). Plaintiff obtained a paramedics license and volunteered as a paramedic from 1980 to approximately 1995. (TR 204-05). Plaintiff worked as a laborer in automotive manufacturing from 1977 until 2003. (TR 67, 209). Plaintiff has not engaged in any substantial gainful activity since November 17, 2003. (TR 67). Plaintiff lives with his wife and child. (TR 208).

Plaintiff reports that he suffers from problems with his knees. (TR 66, 211-12). He reports slipping on some stairs in October or November 2003 and injuring his knees. (TR 210). As a result, at work he was assigned to a sit down job. However, Plaintiff alleges that he gets tired when sitting and takes naps to deal with the pain in his knees. (TR 210). Plaintiff fell asleep on the job a couple of times and was reprimanded for it. (TR 210). Plaintiff retired in 2004. (TR 211).

Plaintiff has had three surgeries on his right knee and one surgery on his left knee. (TR 211). Plaintiff testified that his doctor told him that he is too young for a knee replacement and wants Plaintiff's knee "to last as long as it can." (TR 212). Plaintiff also complains of carpal tunnel syndrome in both hands which causes his hands to fall asleep. (TR 212). Plaintiff testified that he had not had a chance to talk to his doctor about it and he was not considering surgery at that time. (TR 212-13).

Plaintiff's sleep is not continuous and he gets up two or three times a night when his legs get stiff. (TR 78, 214). Plaintiff believes this is because he is not active enough during the day to be

tired at night. (TR 214). Plaintiff testified that during the summer he swims every day and sleeps better. (TR 215). Plaintiff reports that prior to this injury he was able to walk without pain and swelling, sit without his legs and knees getting stiff, run, bend and "pick up heavy things all day long with no problems." (TR 78, 81).

Plaintiff testified that he cooks, sweeps, mops, vacuums and washes laundry. (TR 216). Plaintiff does not wash dishes because it hurts him to stoop over the low sink. (TR 216). Plaintiff uses a riding lawn mower and takes a break every hour when he mows. (TR 79, 220). Similarly, Plaintiff takes a break every hour when he drives. (TR 224). Plaintiff uses cruise control when he drives long distances and testified that he does not think he could do it otherwise. (TR 224). Plaintiff does stained glass as a hobby and watches television. (TR 81, 218).

Plaintiff grocery shops but testified that he has to stop and rest if the shopping exceeds forty-five minutes. (TR 80, 217). He testified that he sometimes uses the scooter shopping carts. (TR 217). Plaintiff testified that he goes for walks two to three times per day for approximately ten to fifteen minutes each time before he has to rest and elevate his feet. (TR 218). However, Plaintiff reported in a Function Report dated September 12, 2004 that he can walk for twenty to forty minutes before the joints in his knees "start popping." (TR 82). Plaintiff reported that he uses a cane when he has to walk long distances and the cane was prescribed in 2001. (TR 83). Plaintiff testified that he does not stoop or kneel. (TR 82, 225). If he has to tie his shoes he either bends over or sits and puts his foot up. (TR 225). Plaintiff naps for two to three hours each day and elevates his feet four to six times per day for five or ten minutes each time. (TR 226-27).

In response to the ALJ's questioning, Plaintiff testified that if he had to carry weight, he could only lift less than ten pounds. (TR 221). However, Plaintiff testified that he could pick up twenty pounds if he only had to move it from "point A to point B." (TR 221). Plaintiff testified that

3

he cannot stand for a full hour and could stand for approximately ten to twenty minutes before he would have to change positions to sitting or walking. (TR 221-22). Plaintiff testified that he can sit for twenty to thirty minutes if he's not moving his legs at all and may be able to sit for up to an hour before he would have to get up and walk. (TR 222). Plaintiff agreed that the maximum he can sit per day is three to four hours. (TR 224). Plaintiff further reports that he cannot squat or his knees will "pop" and he does not climb stairs unless he has to because "each step hurts both knees." (TR 82).

**Medical Record**

On December 4, 1998 Kenneth W. Distler, M.D. performed an arthroscopy, debridement of the anterior cruciate ligament and partial medial meniscectomy of Plaintiff's right knee. (TR 95-96). On February 11, 2000 Plaintiff underwent another surgery on his right knee including a debridement with resection of multiple loose bodies, chrondroplasty of the right patellofemoral joint and right medial femoral condyle. (TR 97-98).

Plaintiff was treated through his employer from January 6, 1997 through June 1, 2004. (TR 100-150). In March 2003 Plaintiff complained of popping in his right knee and a new knee brace was ordered for him. (TR 145-50). On April 25, 2003 Plaintiff complained of sprain and strain of his right wrist with mild pain on active movement. (TR 143). Plaintiff was treated with an ice pack and Ibuprofen. (TR 142). On May 13, 2003 Plaintiff reported that his hand and wrist were "fine" with no loss of range of motion or sensation and no further swelling. (TR 140). In August 2003 Plaintiff complained of pain in his right knee. (TR 135-37). Plaintiff made a request to see "Dr. Distler" again for further treatment of his knee. (TR 137). Plaintiff reported that in the past, Dr. Distler wanted Plaintiff to have a knee replacement and at that time, Plaintiff did not want one so he had not been back to see Dr. Distler. (TR 137). In September 2003 Plaintiff was still awaiting

authorization and referral to Dr. Distler. (TR 134). Plaintiff complained of increasing knee pain and reported that the pain was at a 9-10 every day on a scale 10. (TR 133-34).

On September 16, 2003 Plaintiff reported that when he awoke, he was unable to bend his knee. (TR 132-33). Plaintiff went to the emergency room and x-rays revealed no evidence of acute bony injury. (TR 132, 151-53). Plaintiff was diagnosed with a meniscus injury. (TR 131). Plaintiff was given a new neoprene knee brace and returned to work on September 17, 2003. (TR 130). On September 25, 2003 Dr. Distler ordered Plaintiff to return to work with no restrictions. (TR 127). Plaintiff returned to work with his existing restrictions while he awaited an appointment with his primary physician. (TR 127). On September 30, 2003 Kirk Herrick, D.O. restricted Plaintiff to no climbing ladders, no jobs that require stair climbing and no squatting or kneeling. (TR 126).

On October 16, 2003 Plaintiff re-injured his right knee when he slipped on steps. (TR 115-17). Plaintiff reported to the medical department wearing his knee brace and assisted by two co-workers. (TR 117). On October 17, 2003 Plaintiff reported moderate pain and discomfort. (TR 114). The treatment provider noted moderate edema on the right knee and noted that Plaintiff could perform active range of motion bilaterally. (TR 114). On October 23, 2003 Plaintiff complained that his knee felt worse with motion. (TR 119). Dr. Herrick noted that Dr. Distler recommended surgery if injections to Plaintiff's knee did not work. (TR 120). On November 3, 2003 Plaintiff reported being upset that he was in pain and "no one will authorize him to be treated." (TR 112). Notes from November 3, 2003 indicate that Plaintiff was to return to work with the "previous restrictions for sitting or standing at will, no kneeling, squatting, climbing stairs or ladders." (TR 111). Plaintiff continued to visit his employer's medical department every few days complaining of popping sounds in the left and/or right knee and pain in the right knee. On November 20, 2003 Dr. Herrick noted that Plaintiff had a negative x-ray of the left knee. (TR 105). An MRI of the left

5

knee on November 22, 2003 revealed degenerative signal in the medial meniscus without demonstration of a meniscal tear, a small focus of abnormal signal in the medial femoral condyle consistent with a small enchondroma, a small degenerative cyst in the proximal tibia and a small joint effusion. (TR 154).

On December 1, 2003 James R. Weir, M.D. noted that Plaintiff had slight effusion within the right knee joint. (TR 156). An x-ray revealed "a well maintained medial and lateral joint space, some slight changes at the patellofemoral joint. . . . The medial and lateral joint spaces have not progressed in their arthritic changes." (TR 156). Plaintiff was diagnosed with "probable underlying chondromalacia to the patella" and a torn meniscus of the right knee. (TR 156, 159). On December 23, 2003 Dr. Weir performed a medial compartment arthroscopy with partial medial meniscectomy, lateral compartment arthroscopy and patellofemoral compartment arthroscopy and right chondroplasty to the patella on Plaintiff's right knee. (TR 101, 159). On January 7, 2004 Dr. Weir noted that Plaintiff's right knee was without effusion and Plaintiff started straight leg raising and an exercise bike program. (TR 156). Plaintiff reported that his left knee was bothering him and he wanted to have the arthroscopy performed on that knee, too. (TR 156). On February 18, 2004 Dr. Weir noted that Plaintiff had not been doing his exercises and Plaintiff complained that the left knee continued to bother him. (TR 157).

On February 27, 2004 Dr. Weir performed a medial compartment arthroscopy with resection of pathologic medial plica, lateral compartment arthroscopy with chondroplasty to the lateral tibial plateau and patellofemoral compartment arthroscopy with chondroplasty to the patella on Plaintiff's left knee. (TR 161). In March 2004, Dr. Weir put Plaintiff on a program including straight leg raises, an exercise bike for twenty minutes per day and walking for twenty minutes per day. (TR 157). Dr. Weir kept Plaintiff off work at that time. (TR 157). On April 26, 2004 Dr. Weir noted

that Plaintiff was doing the straight leg raises and his legs were getting "nice and strong." (TR 157). Dr. Weir also noted that Plaintiff did "not think he can go back to work because of discomfort." (TR 157). Dr. Weir stated that was "fine" with him if Plaintiff did not feel he was up to work and he would "have him off work at this point." (TR 157). Dr. Weir noted that although Plaintiff may have the early start of arthritis in his knee joint, nowhere on the x-ray of his arthroscopy did it show that his joint was bone on bone. (TR 157). Therefore, Dr. Weir would not recommend any kind of total knee arthroplasty at that time. (TR 157). Dr. Weir noted that Plaintiff was looking at retiring from work and Dr. Weir thought that was "a good idea since he has pain that will probably get worse if he returns to work." (TR 157).

On June 1, 2004 Dr. Herrick noted Plaintiff's diagnosis as "chondromalacia of patella and bilateral torn meniscus and degenerative joint disease of both knees." (TR 100). Dr. Herrick further noted that Plaintiff had been treated for depression and cried in Dr. Herrick's office on two occasions. (TR 100). Dr. Herrick noted the following: "At this time he cannot walk without support. Cannot do any job in this plant since he can't get to a work station. He has pain even without use. Medication to relieve pain not safe for use at work." (TR 100).

According to an agency Physical Residual Functional Capacity Assessment dated October 8, 2004 Plaintiff has the following exertional limitations: Occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk at least two hours in an eight-hour workday, sit about six hours in an eight-hour workday, push and/or pull (including operation of hand and/or foot controls) is limited in the lower extremities and Plaintiff must avoid constant foot controls. (TR 164). Plaintiff is further limited to occasionally climbing ramps and stairs and never climbing ladders, ropes and scaffolds. (TR 165). Plaintiff should avoid concentrated exposure to extreme cold and hazards. (TR 167).

On October 13, 2004 Dr. Weir noted that Plaintiff's knees "are feeling a great deal better for him." (TR 158). Plaintiff had "absolutely no effusion within the knee joint" and "very good range of motion." (TR 158). X-rays revealed a well-maintained medial and lateral joint space, the patellofemoral joint looked "quite good" and Plaintiff had no signs of progression of the arthritic changes. (TR 158).

Plaintiff reported that he began treating with S. Nagarkar, M.D. in December 2005 for anger, "slight depression" and not sleeping. (TR 219, 179). Plaintiff reported that he was taking Zocor and Prevacid. (TR 179). Plaintiff denied any suicidal ideation. (TR 179). Dr. Nagarkar diagnosed major depression recurrent and comorbid generalized anxiety. (TR 180). Dr. Nagarkar prescribed Lexapro 10 mg. per day. (TR 180). On January 5, 2006 Dr. Nagarkar noted that Plaintiff reported feeling better and that his irritability had improved. (TR 175, 219). Plaintiff was advised to continue taking Lexipro and Seroquel. (TR 175, 219). The diagnosis was major depression recurrent. (TR 175).

In December 2005 Plaintiff was examined by Hoat Vu, M.D. for complaints of numbness in both hands, neck pain and paresthesias in his upper extremities. (TR 181-82). In January 2006 Plaintiff underwent an electrodiagnostic study with Devinderjit Singh Bhangu, M.D. (TR 176). It was an abnormal electrodiagnostic study and showed evidence consistent with bilateral carpal tunnel syndrome that was more pronounced on the right side and evidence at the elbow consistent with bilateral cubital tunnel syndrome. (TR 178). Dr. Bhangu recommended that Plaintiff use bilateral wrist splints and elbow pads and avoid repetitive hand/wrist movements and pressure over the elbows. (TR 178).

Dr. Weir completed a physical Medical Source Statement dated September 3, 2006 which concluded that Plaintiff had the following limitations: Occasionally lift/carry/upward pull for not

more than 1/3 of an eight-hour day a maximum of twenty pounds, frequently lift/carry, upward pull for not more than 1/3 to 2/3 of an eight-hour day ten pounds, stand/walk for at least two hours of an eight-hour day, must alternate sitting during an eight-hour day and mild limitations in the lower extremities for pushing/pulling including the operation of hand and/or foot controls. (TR 200). Dr. Weir indicated that Plaintiff's limitations would likely disrupt a regular job schedule with low physical demands for sixty hours out of a 160 hour work month. (TR 200).

## **ADMINISTRATIVE LAW JUDGE'S DETERMINATION**

The ALJ found that although Plaintiff met the disability insured status requirements through December 31, 2008, had not engaged in substantial gainful activity at any time relevant to the ALJ's decision, and suffered from bilateral knee degenerative joint disease with past arthroscopy and obesity, all severe impairments, he did not have an impairment or combination of impairments that met or equaled the Listing of Impairments. (TR 17). Additionally, the ALJ found Plaintiff's testimony was not entirely credible, he could not perform his past relevant work and his exertional limitations did not allow him to perform the full range of light work, but concluded that he was capable of performing a significant number jobs in the economy. (TR 21). Therefore he was not suffering from a disability under the Social Security Act. (TR 21-22).

## **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Commissioner*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

**DISCUSSION AND ANALYSIS**

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1) he was not presently engaged in substantial gainful employment; and

(2) he suffered from a severe impairment; and

(3) the impairment met or was medically equal to a "listed impairment;" or

(4) he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his residual functional capacity ("RFC"), age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *Id*. § 404.1520(f). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility, failed to properly evaluate the medical records and formed an inaccurate hypothetical that did not portray Plaintiff's impairments.

*Plaintiff's Credibility*

Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Furthermore, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 404.1529(c)(2). In addition to objective medical evidence, the ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 404.1529(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

The ALJ found that Plaintiff's subjective complaints are not fully credible. (TR 18). The ALJ stated that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are generally, but not entirely credible." (TR 18). The ALJ specifically noted that Plaintiff alleges that he is unable to work due to problems with his knees. (TR 18). The ALJ noted however, Plaintiff spends his days engaged in small tasks around

his home, including babysitting for his grandchildren, driving his wife, letting his pets in and out of the house, dressing, bathing and grooming, mowing the lawn, preparing meals, and doing "some" sweeping, mopping, vacuuming and laundry. (TR 18). The ALJ also noted where Plaintiff alleges he needs to take breaks or elevate his feet during these activities. (TR 18). The ALJ noted that Plaintiff's activities of daily living are a combination of light and sedentary tasks allowing Plaintiff to frequently change position, consistent with the established RFC. (TR 20).

The ALJ also noted that although Plaintiff testified that he has to elevate his feet higher than waist level approximately four to six times per day for ten minutes at a time, this accommodation is not noted by any source in the record. (TR 20). Again, however, the ALJ noted that if this allegation is credited, it is accommodated and Plaintiff could meet this need during his break periods when he is not working. (TR 20). The ALJ also pointed out that Plaintiff testified that he naps for two or three hours per day and, again, "there is nothing in the record to suggest that this is medically necessary." (TR 20). The ALJ considered evidence in the record showing that Plaintiff's night-time sleep improved with medication, "which would eliminate the need for a daytime nap," and Plaintiff's statement that he believes his problem with sleep at night was due to the fact that he was not active enough during the day. (TR 20). Therefore, where the ALJ questioned Plaintiff's credibility relating to the intensity, duration and limiting effects of his symptoms, the ALJ specifically pointed to the lack of supporting medical evidence, Plaintiff's activities of daily living, the effectiveness of medication, and measures used to relieve pain, such as elevating his legs. The ALJ's determinations regarding Plaintiff's credibility are supported by substantial evidence.

***Whether Plaintiff's RFC is Supported By Substantial Evidence in the Record***

The ALJ properly determined Plaintiff's RFC based on all of the evidence of record and found that Plaintiff can perform a limited range of light work that involves lifting no more than

13

twenty pounds occasionally or ten pounds frequently. (TR 17). The ALJ determined that Plaintiff can stand/walk two hours in an eight hour workday and sit six hours in an eight hour workday, with the opportunity to alternate sitting and standing. (TR 17). The ALJ further found that Plaintiff is precluded from constant use of lower extremities for pushing a foot pedal or other foot controls. He can occasionally climb ramps/stairs, balance, stoop, crawl, crouch, or kneel. He can never climb ladders, ropes, or scaffolds. He should avoid concentrated exposure to extreme cold or hazards. (TR 17).

The exertional limitations and the push/pull limitations including the use of foot controls in the RFC are consistent with Dr. Weir's September 6, 2006 Medical Source Statement and the agency's October 8, 2004 assessment. (TR 164, 200). The stand/walk limitation in the RFC is more restrictive than Dr. Weir's assessment. (TR 200). The RFC includes Dr. Weir's and the agency's assessment that Plaintiff must be able to alternate sitting and standing. (TR 164, 200). The RFC also includes the agency's assessment that Plaintiff should never climb ladders, ropes and scaffolds, only occasionally climb ramps and stairs and avoid concentrated exposure to extreme cold and hazards including machinery and heights. (TR 165).

Plaintiff acknowledges that the ALJ considered Dr. Weir's Medical Source Statement and that it is similar to the RFC. (Pl's Br. At 13, docket no. 6). However, Plaintiff argues that the RFC is not supported by Dr. Weir's opinion that Plaintiff's limitations would likely disrupt a regular 160 hour per month job schedule with low physical demands for a total of sixty hours per month. (TR 200).

It is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference. The ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

14

inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2)(3)(4). Although it is proper for the ALJ to give a treating physician's opinion controlling weight, the Social Security Administration Regulations do not afford the same deference to opinions on an issue reserved to the Commissioner, such as a final determination of "disabled" or "unable to work" and the ALJ properly makes the determination of the claimant's residual functional capacity. Dispositive administrative findings relating to the determination of a disability are within the purview of the Commissioner. *See* 20 C.F.R. § 404.1527(e).

The ALJ explained the weight he gave Dr. Weir's opinion that Plaintiff's work would be disrupted for approximately sixty hours per month. (TR 19-20). First, the ALJ called the statement "nebulous" because "it is not clear whether he is stating that the claimant was unable to work consistently even within the specific limitations he assessed." (TR 19). Second, the ALJ noted that even if Dr. Weir intended to suggest that Plaintiff could not sustain a regular work schedule on a full time basis, this statement was inconsistent with Dr. Weir's treatment records showing a good recovery and essentially normal clinical findings by October 2004. (TR 20). In April 2004 Dr. Weir noted that Plaintiff's legs were getting "nice and strong." (TR 157). In October 2004 Dr. Weir noted that Plaintiff had good range of motion, no effusion in the knee joints and no evidence that the arthritis was progressing. (TR 158). Therefore, the ALJ showed that this portion of the opinion was inconsistent with other substantial evidence in the record. Finally, the ALJ stated that the opinion was inconsistent with other opinions of record. (TR 20). The ALJ noted the agency's October 2004 conclusion that Plaintiff had a RFC consistent with the ability to perform a limited range of light work. (TR 19, 163-70).

Plaintiff argues that the ALJ may not accept the opinion of an "enhanced examiner" over that of a treating physician. (Pl's Br. At 14, docket no. 6). However, treating physicians' opinions are

"only accorded great weight when they are supported by sufficient clinical findings and are consistent with the evidence." *See Cutlip v. Sec'ty of Health and Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994). The ALJ properly considered the agency's assessment, and, as stated above, the ALJ found that Dr. Weir's statement was not supported by sufficient findings or consistent with other substantial evidence in the record. For the reasons stated above, the ALJ was not required to make a finding that Plaintiff was disabled based on Dr. Weir's statement that Plaintiff's limitations would disrupt his work for approximately sixty hours per month.

Plaintiff also argues that Dr. Weir's April 26, 2004 opinions were not evaluated by the ALJ, however, the ALJ's decision shows that he considered Dr. Weir's April 26, 2004 notes. (Pl's Br. at 14, docket no. 6). The ALJ references Dr. Weir's note from the same examination date that Plaintiff's legs were getting stronger, suggesting that the ALJ considered the April 26, 2004 notes. (TR 19, 157-58); *See Hoelck v. Comm'r of Social Sec.*, 2008 WL 64705 (5th Cir. Jan. 7, 2008) (citing extensively to the medical visit suggested that the ALJ considered it). On April 26, 2004 Dr. Weir noted that Plaintiff did not think he could go back to work because of discomfort and Dr. Weir explained to Plaintiff that "indeed it is absolutely fine with me if he doesn't feel that he is up to work. I am going to put down to have him off work at this point." (TR 158). Dr. Weir stated that Plaintiff "is looking at retiring from work and I think that this is a good idea since he has pain that will probably get worse if he returns to work." (TR 158). Dr. Weir's comments in this respect appear to be based on and in response to Plaintiff's subjective comments, rather than medical evidence. 20 C.F.R. § 404.1527(d)(3). Further, the comments do not support more restrictive limitations than those given in the ALJ's RFC. The ALJ properly made administrative findings based on substantial evidence in the record.

***Whether the ALJ's Hypothetical to the VE Accurately Described Plaintiff***

Plaintiff argues that the ALJ's hypothetical to the vocational expert ("VE") did not accurately describe Plaintiff therefore the VE's testimony did not constitute substantial evidence. Plaintiff contends that the hypothetical question was insufficient because it did not include Plaintiff's alleged need to elevate his feet and legs above waist level on an unpredictable basis. In a hypothetical question posed to the vocational expert ("VE"), an ALJ is required to incorporate only those limitations which he finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Serv.,* 987 F.2d 1230, 1235 (6th Cir. 1993).

The hypothetical incorporates Plaintiff's RFC and limitations as determined by the ALJ. The ALJ is responsible for assessing Plaintiff's RFC based on all of the relevant evidence in the record. 20 C.F.R. § 404.1546(c). As discussed above, the ALJ's findings regarding Plaintiff's impairments and limitations are supported by substantial evidence.

The ALJ asked the VE two hypothetical questions at the hearing. In the first, the ALJ asked the VE to assume a hypothetical person the same age and education as Plaintiff, with the capacity to occasionally lift and carry twenty pounds and to frequently carry ten pounds, the ability to "stand and walk with no breaks or (sic) two out of eight-hour a day with sit/stand option" on an as needed basis, the ability to sit for six hours of an eight-hour day with a sit/stand option as needed, push/pull requirements limited to the lower extremities as less than constant, no climbing ladders, ropes and scaffolds and all other postural limitations only limited to occasionally, avoid concentrated exposure to hazardous machinery and heights, and no visual communicative limitations. (TR 231-32).

The VE testified that this hypothetical person would not be able to perform Plaintiff's past relevant work. (TR 232). However, the VE testified that in the "light capacity," there would be a reduced range of assembly jobs available, "reduced by 50 percent to 2,700 jobs in the region and 50,000 nationally," a reduced range of inspector positions available, "reduce[d] by 50 percent to

17

3,100 jobs in the region, and 70,000 nationally," and a reduced number of packer positions available, reduced by fifty percent to 3,200 regionally and 101,000 nationally. (TR 232-33). The VE referenced the DOT for each of the jobs. (TR 232-33). Plaintiff argues that this hypothetical is based on the agency's RFC assessment and not that of a medical professional. Plaintiff argues that the second hypothetical was based on the medical source statement of Dr. Weir[1]. However, as discussed above, the first hypothetical question incorporates the same limitations as Plaintiff's RFC, which is supported by substantial evidence, including Dr. Weir's medical source statement. The hypothetical accurately described Plaintiff, therefore, the ALJ properly relied on the VE's testimony in finding that there are a significant number of jobs that Plaintiff can perform.

The ALJ's finding that there are a significant number of jobs in the economy which Plaintiff can perform is supported by substantial evidence in the record including the VE's testimony.

**CONCLUSION**

The ALJ's opinion is supported by substantial evidence. Defendant's Motion for Summary Judgment (docket no. 7) should be granted, that of Plaintiff denied and the instant complaint dismissed.

**REVIEW OF REPORT AND RECOMMENDATION**

---

[1] The ALJ's second hypothetical asked the VE to assume a person of the same age and education as Plaintiff with the capacity to occasionally lift and carry a maximum of not greater than ten pounds, the ability to stand and walk with normal breaks for two out of eight hours, the ability to sit for a maximum of three out of eight hours, with all of the standing and sitting with a sit/stand option on an as-needed basis, pushing and pulling "is commenced" with the lift/carry limitations as to upper extremities, cannot climb ladders, ropes or scaffolds, may never kneel, crouch or crawl and all other postural limitations are reduce to less than occasionally, limited in manipulating to fingering and feeling less than occasionally bi-laterally and must avoid all exposure to extreme cold and extreme heat, vibrations and hazards. (TR 233-34). The VE testified that there are no jobs in the state or national economy that this person could perform. (TR 234).

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 11, 2008          s/ Mona K. Majzoub
                               MONA K. MAJZOUB
                               UNITED STATES MAGISTRATE JUDGE


### PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: March 11, 2008          s/ Lisa C. Bartlett
                               Courtroom Deputy

19